**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**NEWARK DIVISION**

| | |
|---|---|
| MISTY MARLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>QUEST DIAGNOSTICS INCORPORATED,<br><br>Defendant. | No.<br><br>**COMPLAINT - CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Misty Marler ("Plaintiff") bring this Class Action Complaint on behalf of herself individually, and on behalf of all others similarly situated against Defendant Quest Diagnostics Incorporated ("Quest" or "Defendant") and alleges, upon personal knowledge as to her own actions and her counsels' investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF ACTION

1. On October 21, 2026, Quest learned of unauthorized access to its Quanum Lab Services Manager ("Quanum LSM") system—a digital platform that healthcare providers use to place laboratory test orders, receive results, and look up patient data—and, on October 22, 2026, Quest publicly disclosed in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") that "an

unauthorized party accessed certain patient records" (the "Data Breach" or "Breach").[1]

2. Quest has admitted that Patient Health Information ("PHI") and "Patient Identifiable Information ("PII") was part of the unauthorized access, but it is still investigating to determine the specific data affected. Though information regarding the specific types of exfiltrated PHI and PII involved has not been dis-closed, upon information and belief, the compromised PHI and PII included the types of information used to order, process, and report laboratory testing, including, inter alia, names, mailing addresses, phone numbers, email addresses, dates of birth, Social Security numbers, genders, information related to medical providers and services (such as dates of service, name of lab, referring doctor, test names, and internal patient identification numbers), diagnosis codes, and insurance policy numbers (collectively, "Confidential Information").

3. Quest markets itself as "the world's leading provider of diagnostic information services," purports to annually serve one in three adult Americans and half the physicians and hospitals in the United States, and recently reported third quarter 2026 revenues of $3.10 billion.[2] On October 23, 2026, Quest confirmed on

---

[1] Quest Diagnostics Inc., Current Report (Form 8-K) (Oct. 22, 2026), https://www.sec.gov/Archives/edgar/data/1022079/000094787126000941/ss6979200_8k.htm.

[2] Quest Diagnostics Reports Third Quarter 2026 Financial Results; Raises Revenue and EPS Guidance for Full Year 2026, Quest Diagnostics, https://ir.questdiagnostics.com/pressreleases/press-release-details/2026/Quest-Diagnostics-Reports-Third-Quarter-2026-FinancialResults-Raises-Revenue-and-EPS-Guidance-for-Full-Year-2026/default.aspx

its website that "some patient data within Quanum LSM was accessed."[3]

4. Plaintiff and Class Members are patients and customers of Defendant and/or Defendant's healthcare provider clients, and other individuals who entrusted their sensitive, non-public PII to the Defendant. To conduct its operations and provide diagnostic testing and related services, Defendant necessarily collects Plaintiff's and Class Members' PII, which it retains for extended periods, including long after the relationship has concluded.

5. Entities like Defendant that handle PII owe the individuals to whom that data relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of PII to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including, but not limited to, the invasion of their PII.

6. Upon information and belief, Defendant breached these duties owed to Plaintiff and Class Members by failing to safeguard the PII it collected and maintained, including by failing to implement industry standards for data security to protect against, detect, and stop cyber-attacks, which failures allowed criminal

[3] Quanum LSM Notice, Quest Diagnostics, https://www.questdiagnostics.com/links/quanum-notice (last visited Oct. 23, 2026).

hackers to access and steal Plaintiff's and Class Members' PII from the Defendant.

7. Upon information and belief, Defendant failed to adequately protect Plaintiff's and Class Members' PII—and, failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted PII was compromised due to Defendant's negligent and/or careless acts and omissions, and its utter failure to protect the sensitive data of its patients and customers.

8. Upon information and belief, Defendant maintained the PII of patients, customers, and other associated individuals in a reckless manner. In particular, PII was maintained on and/or accessible from Defendant's network in a condition vulnerable to cyber-attacks. Upon information and belief, the mechanism of the cyber-attack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant knew that failing to take reasonable steps to secure the PII left it in a dangerous condition.

9. Cybercriminals targeted and obtained Plaintiff's and Class Members' PII from Defendant's network. As a direct and proximate result of Defendant's inadequate data security protocols and breaches of its duties to handle PII with reasonable care, Plaintiff's and Class Members' PII has been accessed and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

10. The harm resulting from a cyber-attack like this Data Breach manifests

in numerous ways, including identity theft and financial fraud, and the exposure of an individual's PII due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

11. As a result of the Data Breach, Plaintiff and Class Members suffered and will continue to suffer concrete injuries in fact including, but not limited to: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their PII; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive PII, which remains in Defendant's possession and subject to further breaches, so long as Defendant fails to undertake adequate measures to protect the patient data it collects and maintains.

12. To recover from Defendant for these harms, Plaintiff, individually and on behalf of the Class as defined herein, brings claims for negligence/negligence per se, breach of implied contract, and declaratory relief, to address Defendant's

inadequate safeguarding of Plaintiff's and Class Members' PII in its care.

13. Plaintiff and Class Members seek damages and equitable relief requiring Defendant to (a) disclose the full nature of the Data Breach and types of PII exposed; (b) implement data security practices to reasonably guard against future breaches; and (c) provide, at Defendant's expense, all Data Breach victims with lifetime identity theft protection services.

**PARTIES**

14. Plaintiff Misty Marler is a natural person and a citizen of San Clemente, California, where she intends to remain. Plaintiff is a Quest patient, having used Quest Diagnostics at the Camino De Los Mares and Talega locations in San Clemente in Orange County, California. In connection with those services, Plaintiff directly or indirectly entrusted Quest with her Confidential Information. Plaintiff reasonably believed Quest would maintain the privacy and security of that information, comply with its Privacy Notice, and use reasonable measures to prevent unauthorized access and disclosure. Plaintiff believes she paid a premium to Quest for its data security, and she would not have used Quest's services or provided her Confidential Information to Quest had she known that they would disclose, or allow to be disclosed, her Confidential Information, making it available to unauthorized parties. Plaintiff would not have entrusted Quest with her Confidential Information on the same terms had she known Quest would fail to protect it from a foreseeable social-engineering attack and unauthorized exfiltration. Plaintiff has spent time

monitoring for misuse and will continue to spend time protecting herself from the increased risks created by the Data Breach. Plaintiff has a continuing interest in ensuring that the Confidential Information Quest retains is protected from further unauthorized access.

15. Defendant Quest Diagnostics Incorporated is a corporation organized under the laws of the State of Delaware, with its headquarters and principal place of business located in Secaucus, New Jersey.

**JURISDICTION AND VENUE**

16. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, exclusive of interest and costs; at least one member of the proposed Class is a citizen of a state different from Defendant; and the proposed Class includes more than 100 members.

17. This Court has personal jurisdiction over Quest because Quest is headquartered in Pennsylvania, regularly conducts business in Pennsylvania, and has sufficient minimum contacts with Pennsylvania.

18. Venue is proper in this District under 28 U.S.C. § 1391 because Quest's principal office is located in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in or emanated from this District.

## BACKGROUND

***Defendant Collected and Stored the Confidential Information of Plaintiff and the Class***

19. Quest describes itself as "the world's leading provider of diagnostic information services" and provides diagnostic testing through a network of laboratories and patient service centers.

20. Quest's principal business and sole reportable segment is Diagnostic Information Services, which serves physicians, hospitals, patients, and consumers. Its other businesses include risk assessment services for insurers and healthcare information technology services for healthcare providers and payors.

21. Quest provides routine clinical laboratory testing, specialized and advanced diagnostic testing, and anatomic pathology services. These services support the screening, diagnosis, treatment, and monitoring of diseases and other medical conditions, including cancer, cardiovascular disease, diabetes, infectious diseases, and neurological disorders.

22. Quest reports that it serves approximately one in three American adults and half of the physicians and hospitals in the United States annually. In 2025, Quest processed approximately 244 million test requisitions through its laboratory network.

23. Quest performs laboratory testing ordered by physicians, hospitals, and other healthcare providers. Depending on the applicable billing arrangement, Quest

bills patients, health insurers, government healthcare programs, physicians, hospitals, and other entities for its services.

24. To perform these functions, Quest uses electronic systems that support laboratory test ordering, patient information management, reporting of test results, and billing. These systems include Quanum Lab Services Manager ("Quanum LSM"), an online platform that enables healthcare providers to order laboratory tests, track orders, access patients' test results, and supply missing billing information.

25. As a result, Quest collects, generates, and maintains information that identifies patients and reflects their laboratory test orders and results, medical conditions, healthcare providers, insurance coverage, and billing and payment for healthcare services. Quest expressly acknowledges that its laboratory test orders, test results, and invoices contain protected health information and that it stores protected health information electronically.

26. Plaintiff and Class Members relied on Quest to keep their Confidential Information securely maintained, use it only for authorized healthcare and business purposes, and make only authorized disclosures. Plaintiff and Class Members themselves took reasonable steps to maintain the confidentiality of their Confidential Information.

27. In collecting and maintaining Confidential Information, Quest represented in its HIPAA Notice of Privacy Practices that it was "committed to

protecting the privacy of your identifiable health information." Quest further acknowledged that it is legally required to maintain the privacy of patients' protected health information, follow the terms of its Notice, and comply with state privacy requirements that are more restrictive than federal law. Quest also represents that its privacy policies and procedures include administrative, technical, and physical safeguards to protect the privacy and confidentiality of information entrusted to it.

28. Under state and federal law, businesses like Quest have duties to protect Confidential Information in its possession and to notify breach victims about breaches.

***The Data Breach***

29. Upon information and belief, on or before October 21, 2026, an unauthorized party gained unauthorized access to Defendant's Quanum LSM system and accessed and/or acquired certain patient records, including the PII of Plaintiff and Class Members.[4]

30. Upon information and belief, the cyberattack was intentionally orchestrated to infiltrate Defendant's systems and obtain unauthorized access to sensitive and confidential information, including, among other things, the PII of Plaintiff and Class Members.

31. On October 22, 2026, Defendant disclosed in its Form 8-K that it had

[4] See GALAXYWARDEN, supra note 1.

"learned of unauthorized access to its Quanum LSM system," had "initiated its cybersecurity incident response procedures," and "believes that an unauthorized party accessed certain patient records." Defendant has not yet disclosed the full scope of the Data Breach or the specific types of PII exposed for each affected individual.

32. On October 23, 2026, Defendant posted an update on its website stating that, "[u]pon discovery of the incident, we paused access to the system and we are continuing to investigate the incident."

33. Upon information and belief, the data exfiltrated in the Data Breach includes, inter alia, individuals' names, mailing addresses, phone numbers, email addresses, dates of birth, Social Security numbers, genders, information related to medical providers and services (such as dates of service, name of lab, referring doctor, test names, and internal patient identification numbers), diagnosis codes, and insurance policy numbers.

34. Despite the sensitivity of the compromised information, Defendant failed to implement and maintain reasonable security measures to prevent, detect, or timely contain the intrusion.

35. Moreover, at the time of the Data Breach, Quest was already on notice of the risk of a data breach involving its patients' information: Quest previously faced class action lawsuits after a 2018–2019 data breach at billing collections firm American Medical Collection Agency exposed information of millions of laboratory

patients. Despite this knowledge, Quest failed to prevent unauthorized access to its computer systems housing sensitive data.

***Defendant Failed to Adequately Safeguard Plaintiff's and Class Members' PII, Resulting in the Data Breach***

36. Plaintiff's and Class Members' PII was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiff's and Class Members' PII from Defendant's network systems, where they were kept without adequate safeguards and in unencrypted form.

37. As the Data Breach evidences, Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive PII it collected and maintained from Plaintiff and Class Members. These failures by Defendant allowed and caused cybercriminals to target Defendant's network and exfiltrate files containing Plaintiff's and Class Member's PII.

38. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiff's and Class Members' PII, using controls like limitations on personnel with access to sensitive data, training its employees on standard cybersecurity practices, and implementing reasonable logging and alerting methods to detect unauthorized access, but failed to do so.

39. For example, if Defendant had implemented industry standard logging,

monitoring, and alerting systems—basic technical safeguards that PII-collecting entity is expected to employ—then cybercriminals would not have been able to perpetrate malicious activity in Defendant's network systems for the period it took to carry out the Data Breach, including the reconnaissance necessary to identify where Defendant stored PII, installation of malware or other methods of establishing persistence and creating a path to exfiltrate data, staging data in preparation for exfiltration, and then exfiltrating that data outside of Defendant's system without being caught.

***The U.S. Department of Health and Human Services***

40. Plaintiff's and Class Members' Confidential Information is "protected health information" as defined by 45 CFR § 160.103.

41. Pursuant to 45 CFR § 164.408(a), Breach Reports are filed with the Secretary of the U.S. Department of Health and Human Services "following the discovery of a breach of unsecured protected health information."

42. 45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

43. 45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or

methodology specified by the [HHS] Secretary[.]"

44. Plaintiff's and Class Members' Confidential Information is "unsecured protected health information" as defined by 45 CFR § 164.402.

45. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E.

46. Based on information and belief, Defendant itself believes that as a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information has been acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart.

47. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

48. Based on information and belief, Defendant itself reasonably believes Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

49. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was acquired, accessed, used, viewed and/or

disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

50. As a result of the Data Breach, Plaintiff's and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

51. Based on information and belief, Defendant itself as a result of the Data Breach reasonably believes Plaintiff's and Class Members' unsecured protected health information was viewed by unauthorized persons in a manner not permitted under 45 CFR Subpart E.

52. It is reasonable to infer that as a result of the Data Breach Plaintiff's and Class Members' unsecured protected health information that was acquired, accessed, used, viewed, and/or disclosed in a manner not permitted under 45 CFR Subpart E, and was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

53. It should be rebuttably presumed that unsecured protected health information acquired, accessed, used, viewed and/or disclosed in a manner not permitted under 45 CFR Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

54. After receiving notice that they were victims of a data breach that required the filing of a Breach Report in accordance with 45 CFR § 164.408(a), it is

reasonable for recipients of that notice, including Plaintiff and Class Members in this case, to believe that future harm (including identity theft) is real and imminent, and to take steps to mitigate that risk of future harm.

***Quest Acquired, Collected, and Stored Plaintiff's and Class Members' Confidential Information***

55. Quest acquired, collected, stored, used, and transmitted Plaintiff's and Class Members' Confidential Information.

56. As a condition of receiving services, Plaintiff and Class Members were required to entrust Quest, directly or through their healthcare providers and insurers, with highly sensitive PII and PHI.

57. By collecting and storing that information, Quest assumed legal and equitable duties and knew or should have known that it was responsible for protecting the information from unauthorized access and disclosure.

58. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Confidential Information and relied on Quest to keep it secure, use it only for authorized purposes, and make only authorized disclosures.

59. Quest acknowledged in its public filings that cyberattacks involving patient PHI could cause the loss of confidential data, expose it to liability under HIPAA and consumer-protection law, subject it to litigation and government enforcement, and damage its reputation.

60. Quest also acknowledged that it outsourced business functions to third-

party providers and contractors and that those providers might fail to protect Quest's and its patients' confidential data.

61. In its Privacy Notice, Quest represented that it was required by law to maintain the privacy of PHI, provide notice of its legal duties and privacy practices, and follow the terms of the Notice.

62. The Privacy Notice further represented that Quest would use and disclose health information only for identified purposes or with written permission and that its business associates were obligated to protect patient information.

63. Plaintiff and Class Members reasonably relied on Quest's relationship of trust and its representations concerning the confidentiality and security of their health information.

***The Healthcare Sector is Particularly Susceptible to Cyberattacks.***

64. Quest was on notice that healthcare organizations and the vendors and contractors that support them are frequent targets of cyberattacks because they maintain large volumes of valuable PII and PHI.

65. Quest was also on notice that the FBI has been concerned about data security in the healthcare industry. In August 2014, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally

Identifiable Information (PII).”

66. The American Medical Association (“AMA”) has also warned healthcare companies about the importance of protecting their patients’ confidential information:

> Cybersecurity is not just a technical issue; it’s a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients’ health and financial information, but also patient access to care.

67. When compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found that the “average total cost to resolve an identity theft-related incident . . . came to about $20,000,” and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the customers were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals and detrimentally impact the economy as a whole.

68. According to analysis performed by U.S. Department of Health and Human Services (“HHS”), 45 million people in 2021 were affected by healthcare cyberattacks, triple the 14 million affected in 2018. In 2022, HHS posted an alert

warning healthcare organizations of an “exceptionally aggressive” ransomware group that is known to target the healthcare center, and noted that healthcare organizations should try to protect themselves with continuous monitoring and an active vulnerability management program. The alert also suggested keeping backups of data in multiple locations and using two-factor authentication with strong passwords.

69. According to a TENABLE study conducted over a 14-month period, a “root cause was reported in 93.17% of the healthcare breaches disclosed in the 14-month period [it] analyzed. Among these, ransomware was by far the most prominent root cause of healthcare breaches, accounting for a whopping 54.95%. Other leading causes included email compromise/phishing (21.16%), insider threat (7.17%) and unsecured databases (3.75%).”

70. In a survey released by Ponemon Institute in January 2023, nearly half of respondents (47%) said their organizations experienced a ransomware attack in the past two years, up from 43% in 2021. 45% of those respondents reported complications from medical procedures due to ransomware attacks, up from 36% in 2021.

71. In light of several recent high profile cybersecurity incidents affecting the healthcare industry, including the American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July

2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Quest knew or should have known that their electronic records would be targeted by cybercriminals.

72. Given the nature of the Data Breach, it is foreseeable that the compromised Confidential Information will be used to access Plaintiff's and the Class members' other accounts, thereby providing access to additional Confidential Information or personal and sensitive information. Therefore, the compromised Confidential Information in the Data Breach is of great value to hackers and unauthorized users and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and unauthorized users. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII." For example, different Confidential Information elements from various sources may be linked in order to identify an individual, or access additional information about or relating to that individual.

73. Further, as technology advances, computer programs may scan the

Internet with an ever-widening scope to create a mosaic of information that may be used to link information to an individual in ways not previously possible. This is known as the "mosaic effect."

74. Names and dates of birth, combined with contact information like telephone numbers and addresses, are very valuable to hackers and identity thieves as these items allow them to access users' other accounts, particularly when those users have easily decrypted passwords or security questions.

75. The Confidential Information that Defendant exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breach can be used in a variety of unlawful manners, including opening new credit and financial accounts in victims' names, obtaining protected health information, and/or committing medical fraud.

76. Unfortunately, for Plaintiff and Class members, a person whose Confidential Information has been compromised may not fully experience the effects of the breach for years to come:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

77. Accordingly, as a healthcare entity in possession of its Plaintiff's and Class Members' Confidential Information, Defendant knew, or should have known,

the importance of safeguarding the Confidential Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached.

78. Healthcare cyberattacks threaten not only financial privacy, but also the confidentiality and integrity of medical records and patients' ability to obtain appropriate care.

79. HHS has specifically warned the healthcare and public-health sector that social engineering is used to obtain sensitive information, gain unauthorized access, and disrupt operations, and that targets include employees, customers, and vendors.

80. HHS has further warned that phishing remains one of the most effective social-engineering techniques used against healthcare organizations and that technical and non-technical mitigations are both necessary.

81. These warnings were directly relevant to Quest, which acknowledged before the Data Breach that cyberattacks could disrupt its information technology systems and expose confidential patient information.

82. In its 2025 Form 10-K, Quest specifically warned that attackers could target its employees to attack its systems or exploit security vulnerabilities through "electronic spamming, phishing, smishing, spear phishing or similar tactics."

83. Quest further acknowledged that difficulties detecting attacks could allow intrusions, failures, or losses to recur or compound before discovery or

remediation. Quest also recognized that third parties handling confidential patient information, and those third parties' providers, had experienced and remained exposed to these cybersecurity risks.

84. Accordingly, unauthorized access to Quest's systems and the resulting compromise of Confidential Information were foreseeable risks that Quest recognized before the Data Breach. Quest was required to protect electronic protected health information against reasonably anticipated threats to its security or integrity and reasonably anticipated uses or disclosures not permitted or required by the HIPAA Privacy Rule.

***Securing PII and PHI and Preventing Breaches***

85. Quest could have prevented or materially limited the Data Breach by implementing reasonable, well-known safeguards for social engineering, contractor access, authenticated sessions, cloud applications, credentials, and PHI.

86. Defendant's negligence in safeguarding the Confidential Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

87. Despite the prevalence of public announcements of data breach and data security compromises, especially in the healthcare context, Defendant failed to take appropriate steps to protect the Confidential Information of Plaintiff and Class Members from being compromised.

88. The Federal Trade Commission ("FTC") defines identity theft as "a

fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."

89. The ramifications of Defendant's failure to keep secure the PII and PHI of Plaintiff and Class Members are long lasting and severe. Once PII and PHI is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims is an imminent and impending threat of injury that continues for years.

90. As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[5]

91. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the

[5] *See* How to Protect Your Networks from RANSOMWARE, at 3, *available at* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (last accessed Jan. 10, 2025).

following measures:

a. Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

b. Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

c. Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

d. Configure firewalls to block access to known malicious IP addresses.

e. Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

f. Set anti-virus and anti-malware programs to conduct regular scans automatically.

g. Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

h. Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

i. Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

j. Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

k. Consider disabling Remote Desktop protocol (RDP) if it is not being used.

l. Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

m. Execute operating system environments or specific programs in a virtualized environment.

n. Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

92. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have implemented, as recommended by the Federal Bureau of Investigation, the following measures:

a. Update and patch your computer. Ensure your applications and operating systems (OSs) have been updated with the latest patches. Vulnerable applications and OSs are the target of most ransomware attacks….

b. Use caution with links and when entering website addresses. Be careful when clicking directly on links in emails, even if the sender appears to be someone you know. Attempt to independently verify website addresses (e.g., contact your organization's helpdesk, search the internet for the sender organization’s website or the topic mentioned in the email). Pay attention to the website addresses you click on, as well as those you enter yourself. Malicious website addresses often appear almost identical to legitimate sites, often using a slight variation in spelling or a different domain (e.g., .com instead of .net)….

c. Open email attachments with caution. Be wary of opening email attachments, even from senders you think you know, particularly when attachments are compressed files or ZIP files.

d. Keep your personal information safe. Check a website’s security

to ensure the information you submit is encrypted before you provide it….

e. Verify email senders. If you are unsure whether or not an email is legitimate, try to verify the email's legitimacy by contacting the sender directly. Do not click on any links in the email. If possible, use a previous (legitimate) email to ensure the contact information you have for the sender is authentic before you contact them.

f. Inform yourself. Keep yourself informed about recent cybersecurity threats and up to date on ransomware techniques. You can find information about known phishing attacks on the Anti-Phishing Working Group website. You may also want to sign up for CISA product notifications, which will alert you when a new Alert, Analysis Report, Bulletin, Current Activity, or Tip has been published.

g. Use and maintain preventative software programs. Install antivirus software, firewalls, and email filters—and keep them updated—to reduce malicious network traffic….[6]

93. To prevent and detect ransomware attacks, including the ransomware attack that resulted in the Data Breach, Defendant could and should have

[6] *See* Security Tip (ST19-001) Protecting Against Ransomware (original release date Apr. 11, 2019), available at https://www.cisa.gov/news-events/news/protecting-against-ransomware (last visited Jan. 10, 2025).

implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

- **Secure internet-facing assets**
    - Apply latest security updates
    - Use threat and vulnerability management
    - Perform regular audit; remove privileged credentials
- **Thoroughly investigate and remediate alerts**
    - Prioritize and treat commodity malware infections as potential full compromise;
- **Include IT Pros in security discussions**
    - Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;
- **Build credential hygiene**
    - Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords
- **Apply principle of least-privilege**
    - Monitor for adversarial activities
    - Hunt for brute force attempts
    - Monitor for cleanup of Event Logs
    - Analyze logon events
- **Harden infrastructure**
    - Use Windows Defender Firewall
    - Enable tamper protection
    - Enable cloud-delivered protection

- Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[7]

94. Given that Defendant was storing the Confidential Information of millions of individuals, Defendant could and should have implemented all of the above measures to prevent and detect ransomware attacks.

95. The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent ransomware attacks, resulting in the Data Breach and the exposure of the Confidential Information of thousands of individuals, including Plaintiff and Class Members.

***The Value of Confidential Information and the Effects of Unauthorized Disclosure.***

96. At all relevant times, Defendant was well aware that the Confidential Information it collects from Plaintiff and Class Members is highly sensitive and of significant value to those who would use it for wrongful purposes.

97. Confidential Information is a valuable commodity to identity thieves. Identity thieves can use this information to commit an array of crimes including identify theft, and medical and financial fraud. Indeed, a robust cyber black market exists in which criminals openly post stolen PII and PHI on multiple underground

[7] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/ (last visited Jan. 10, 2025).

Internet websites, commonly referred to as the dark web.

98. While credit card information and associated PII can sell for as little as $1-$2 on the black market, PHI can sell for as much as $363 according to the Infosec Institute.

99. PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

100. Medical identify theft can result in inaccuracies in medical records and costly false claims. It can also have life-threatening consequences. If a victim's health information is mixed with other records, it can lead to misdiagnosis or mistreatment. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."

101. Similarly, the FBI Cyber Division, in an April 8, 2014 Private Industry Notification, advised:

> Cyber criminals are selling [medical] information on the black market at a rate of $50 for each partial EHR, compared to $1 for a stolen social security number or credit card number. EHR can

> then be used to file fraudulent insurance claims, obtain prescription medication, and advance identity theft. EHR theft is also more difficult to detect, taking almost twice as long as normal identity theft.

102. The ramifications of Defendant's failure to keep its patients' Confidential Information secure are long lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Fraudulent activity might not show up for six to 12 months or even longer.

103. Further, criminals often trade stolen Confidential Information on the "cyber black-market" for years following a breach. Cybercriminals can post stolen Confidential Information on the internet, thereby making such information publicly available.

104. Approximately 28% of victims do not realize their identify has been compromised until more than a year after it has happened. This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.

105. Breaches are particularly serious in healthcare industries. The healthcare sector reported the second largest number of breaches among all measured sectors in 2018, with the highest rate of exposure per breach. Indeed,

when compromised, healthcare related data is among the most private and personally consequential. A report focusing on healthcare breaches found that the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that the victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.

106. As a healthcare provider, Defendant knew, or should have known, the importance of safeguarding its patients' Confidential Information entrusted to it and of the consequences if its data security systems were breached. This includes the significant costs that would be imposed on Defendant's patients as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

107. The compromised Confidential Information in the Data Breach is of great value to hackers and thieves and can be used in a variety of ways. Information about, or related to, an individual for which there is a possibility of logical association with other information is of great value to hackers and thieves. Indeed, "there is significant evidence demonstrating that technological advances and the ability to combine disparate pieces of data can lead to identification of a consumer, computer or device even if the individual pieces of data do not constitute PII." For example, different PII elements from various sources may be able to be linked in order to identify an individual, or access additional information about or relating to the individual. Based upon information and belief, the unauthorized parties utilized

the Confidential Information they obtained through the Data Breach to obtain additional information of Plaintiff and Class Members that were misused.

108. Further, as technology advances, computer programs may scan the Internet with wider scope to create a mosaic of information that may be used to link information to an individual in ways that were not previously possible. This is known as the "mosaic effect."

109. Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts. Thus, even if payment card information were not involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Confidential Information to access accounts, including, but not limited to email accounts and financial accounts, to engage in the fraudulent activity identified by Plaintiff.

110. Additionally, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage. Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have

a crippling effect on individuals, and detrimentally impact the economy as a whole.

111. The Confidential Information exposed is of great value to hackers and cyber criminals and the data compromised in the Data Breaches can be used in a variety of unlawful manners, including opening new credit and financial accounts in users' names and perpetrating medical and insurance fraud.

***Defendant's Conduct Violates HIPAA.***

112. HIPAA requires covered entities to protect against reasonably anticipated threats to the security of PHI. Covered entities must implement safeguards to ensure the confidentiality, integrity, and availability of PHI. Safeguards must include physical, technical, and administrative components.

113. Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling Confidential Information like the data Defendant left unguarded. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

114. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, also required Defendant to provide notice of the breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

115. Based on information and belief, the Data Breach resulted from a

combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations. Defendant's security failures include, but are not limited to, the following:

a. Failing to ensure the confidentiality and integrity of electronic protected health information that Defendant create, receive, maintain, store and transmit in violation of 45 C.F.R. §164.306(a)(1);

b. Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

c. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1);

d. Failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity in violation of 45 C.F.R. §164.308(a)(6)(ii);

e. Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information in violation of 45 C.F.R. §164.306(a)(2);

f. Failing to protect against any reasonably anticipated uses or disclosures of electronically protected health information that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

g. Failing to ensure compliance with HIPAA security standard rules by their workforce in violation of 45 C.F.R. §164.306(a)(94);

h. Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons in violation of 45 C.F.R. §164.502, et seq.;

i. Failing to effectively train all members of their workforce (including independent contractors) on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of protected health information in violation of 45 C.F.R. §164.530(b) and 45 C.F.R. §164.308(a)(5); and

j. Failing to design, implement, and enforce policies and procedures establishing physical and administrative safeguards to reasonably safeguard protected health information, in compliance with 45 C.F.R. §164.530(c).

***Defendant Failed to Comply with FTC Guidelines.***

116. Defendant was also prohibited by the Federal Trade Commission Act

("FTC Act") (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

117. The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

118. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

119. The FTC further recommends that companies not maintain Confidential Information longer than is needed for authorization of a transaction; limit access to private data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

120. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

121. Defendant failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to patients' Confidential Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

122. Defendant was at all times fully aware of its obligation to protect the Confidential Information of patients because of its position as a trusted healthcare provider. Defendant was also aware of the significant repercussions that would result from its failure to do so.

***Defendant Failed to Comply with Healthcare Industry Standards.***

123. HHS's Office for Civil Rights notes:

> While all organizations need to implement policies, procedures, and technical solutions to make it harder for hackers to gain access to their systems and data, this is especially important in the healthcare industry. Hackers are actively targeting healthcare organizations, as they store large quantities of highly Private and valuable data.

124. HHS highlights several basic cybersecurity safeguards that can be implemented to improve cyber resilience that require a relatively small financial investment, yet can have a major impact on an organization's cybersecurity posture including: (a) the proper encryption of Confidential Information; (b) educating and training healthcare employees on how to protect Confidential Information; and (c) correcting the configuration of software and network devices.

125. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry, Defendant chose to ignore them. These best practices were known, or should have been known by Defendant, whose failure to heed and properly implement them directly led to the Data Breach and the unlawful exposure of Confidential Information.

***Plaintiff and Class Members Suffered Damages***

126. The ramifications of Defendant's failure to keep patients' Confidential Information secure are long-lasting and severe. Once Confidential Information is stolen, fraudulent use of that information and damage to victims may continue for years. Consumer victims of data breaches are more likely to become victims of identity fraud.

127. In addition to their obligations under state laws and regulations, Defendant owed a common law duty to Plaintiff and Class Members to protect Confidential Information entrusted to it, which included exercising reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the

Confidential Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized parties.

128. Defendant further owed and breached its duty to Plaintiff and Class Members to implement processes and specifications that would detect a breach of its security systems in a timely manner and to timely act upon warnings and alerts, including those generated by its own security systems.

129. As a direct result of Defendant's intentional, willful, reckless, and negligent conduct which resulted in the Data Breach, unauthorized parties were able to access, acquire, view, publicize, and/or otherwise cause the identity theft and misuse to Plaintiff's and Class Members Confidential Information as detailed above, and Plaintiff is now at a heightened and increased risk of identity theft and fraud.

130. The risks associated with identity theft are serious. While some identity theft victims can resolve their problems quickly, others spend hundreds of dollars and many days repairing damage to their good name and credit record. Some consumers victimized by identity theft may lose out on job opportunities, or denied loans for education, housing or cars because of negative information on their credit reports. In rare cases, they may even be arrested for crimes they did not commit.

131. Other risks of identity theft include loans opened in the name of the victim, medical services billed in their name, utility bills opened in their name, tax return fraud, and credit card fraud.

132. Plaintiff and Class Members did not receive the full benefit of the

bargain, and instead received healthcare and other services that were of a diminished value to that described in their agreements with Defendant and they were damaged in an amount at least equal to the difference in the value of the healthcare with data security protection they paid for and the healthcare they received.

133. As a result of the Data Breach, Plaintiff's and Class Members' Confidential Information has diminished in value.

134. The Confidential Information belonging to Plaintiff and Class Members is private, private in nature, and was left inadequately protected by Defendant who did not obtain Plaintiff's or Class Members' consent to disclose such Confidential Information to any other person as required by applicable law and industry standards.

135. Plaintiff's and Class Members' Confidential Information may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed Confidential Information for targeted marketing, particularly scam marketing which several Plaintiff has experienced, without the approval of Plaintiff and Class Members. Due to the Data Breach, unauthorized individuals can easily access the Confidential Information of Plaintiff and Class Members.

136. The Data Breach was a direct and proximate result of Defendant's failure to (a) properly safeguard and protect Plaintiff's and Class Members' Confidential Information from unauthorized access, use, viewing, and disclosure, as required by various state and federal regulations, industry practices, and common

law; (b) establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Confidential Information; and (c) protect against reasonably foreseeable threats to the security or integrity of such information.

137. Defendant had the resources necessary to prevent the Data Breach, but neglected to adequately implement data security measures, despite its obligation to protect patient data.

138. Had Defendant remedied the deficiencies in their data security systems and adopted security measures recommended by experts in the field, they would have prevented the intrusions into its systems and, ultimately, the theft of Plaintiff's and Class Members' Confidential Information.

139. As a direct and proximate result of Defendant's wrongful actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of the Data Breach on their lives.

140. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% percent spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."

141. Defendant's failure to adequately protect Plaintiff's and Class Members' Confidential Information has resulted in Plaintiff and Class Members having to undertake numerous tasks to protect their information, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money – while Defendant sit by and do nothing to assist those affected by the incident. Instead, as Defendant's Data Breach notice indicates, it is putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

142. Plaintiff and Class Members have been damaged in several other ways as well. Plaintiff and Class Members have been exposed to an impending, imminent, and ongoing increased risk of fraud, identity theft, and other misuse of their Confidential Information. Plaintiff and Class Members must now and indefinitely closely monitor their financial and other accounts to guard against fraud. This is a burdensome and time-consuming activity. Class Members may have also purchased credit monitoring and other identity protection services, purchased credit reports, placed credit freezes and fraud alerts on their credit reports, and spent time investigating and disputing fraudulent or suspicious activity on their accounts. Plaintiff and Class Members also suffered a loss of the inherent value of their Confidential Information.

143. The Confidential Information stolen in the Data Breach can be misused on its own, or can be combined with personal information from other sources such

as publicly available information, social media, etc. to create a package of information capable of being used to commit further identity theft. Thieves can also use the stolen Confidential Information to send spear-phishing emails to Class Members to trick them into revealing sensitive information. Lulled by a false sense of trust and familiarity from a seemingly valid sender (for example Wells Fargo, Amazon, or a government entity), the individual agrees to provide sensitive information requested in the email, such as login credentials, account numbers, and the like.

144. As a result of Defendant's failures to prevent the Data Breach, Plaintiff and Class Members have suffered, will suffer, and are at increased risk of suffering:

a. The compromise, publication, theft and/or unauthorized use of their Confidential Information;

b. Out-of-pocket costs associated with the prevention, detection, recovery and remediation from identity theft or fraud;

c. Lost opportunity costs and lost wages associated with efforts expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from identity theft and fraud;

d. The continued risk to their Confidential Information, which remains in the possession of Defendant and is subject to further breaches

so long as Defendant fail to undertake appropriate measures to protect the Confidential Information in their possession;

e. Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members; and

f. Anxiety and distress resulting from fear of misuse of their Confidential Information.

145. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their Confidential Information is secure, remains secure, and is not subject to further misappropriation and theft.

***Defendant's Delay in Identifying & Reporting the Breach Caused Additional Harm***

146. It is axiomatic that:

> The quicker a financial institution, credit card issuer, wireless carrier or other service provider is notified that fraud has occurred on an account, the sooner these organizations can act to limit the damage. Early notification can also help limit the liability of a victim in some cases, as well as allow more time for law enforcement to catch the fraudsters in the act.

147. Indeed, once a data breach has occurred:

> [o]ne thing that does matter is hearing about a data breach quickly. That alerts consumers to keep a tight watch on credit

> card bills, insurance invoices, and suspicious emails. It can prompt them to change passwords and freeze credit reports. And notifying officials can help them catch cybercriminals and warn other businesses of emerging dangers. If consumers don't know about a breach because it wasn't reported, they can't take action to protect themselves (internal citations omitted).

148. Quest disclosed that it learned of unauthorized access to its Quanum LSM system on October 21, 2026. In its October 26, 2026 update, Quest stated that it was still investigating the specific information affected and identifying affected patients. Quest further stated that it would send notification letters to affected patients upon completion of its investigation.

149. Plaintiff and Class Members who have not received individualized notice identifying the Confidential Information affected cannot determine from Quest's public disclosures which of their information was compromised. This uncertainty impairs their ability to assess their exposure and promptly take protective measures tailored to the information involved.

## CLASS ACTION ALLEGATIONS

150. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All persons whose Confidential Information was compromised in the Data Breach.

151. Plaintiff separately seeks to represent a "California Subclass" defined as:

> All persons residing in the State of California whose

Private Information was accessed in the Data Breach ("California Subclass").

152. Excluded from the Classes are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

153. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

154. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of Plaintiff's claims on class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

155. Ascertainability: All members of the proposed Class are readily ascertainable from information in Defendant's custody and control.

156. Numerosity, Fed R. Civ. P. 23(a)(1): The Nationwide Class and state Subclass (the "Classes") are so numerous that joinder of all members is impracticable. Defendant's records and expert discovery will demonstrate when this number is accurate and will identify members of the Classes.

157. Typicality: Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

158. Adequacy: Plaintiff will fairly and adequately protect the proposed Class's common interests. Plaintiff's interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

159. Commonality and Predominance: Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions.

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's Confidential Information;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing Confidential Information;

d. if Defendant breached contract promises to safeguard Plaintiff and the Class's Confidential Information;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if the Data Breach caused Plaintiff and the Class injuries;

g. what the proper damages measure is; and

h. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

160. Superiority: A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

161. Unless a Class-wide injunction is issued, Plaintiff and Class Members remain at risk that Defendant will continue to fail to properly secure the Confidential Information of Plaintiff and Class Members resulting in another data breach, continue to refuse to provide proper notification to Class Members regarding the Data Breach, and continue to act unlawfully as set forth in this Complaint.

162. Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

163. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

164. Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

165. Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Confidential Information;

166. Whether Defendant failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

167. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach; and

168. Whether Class Members are entitled to actual damages, credit monitoring or other injunctive relief, and/or punitive damages as a result of

Defendant's wrongful conduct.

## FIRST CAUSE OF ACTION

**Negligence**

**(On Behalf of Plaintiff and the Class)**

169. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

170. Plaintiff and the Class entrusted their Confidential Information to Defendant on the premise and with the understanding that Defendant would safeguard their Confidential Information, use their Confidential Information for business purposes only, and/or not disclose their Confidential Information to unauthorized third parties.

171. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their Confidential Information in a data breach. And here, that foreseeable danger came to pass.

172. Defendant has full knowledge of the sensitivity of the Confidential Information and the types of harm that Plaintiff and the Class could and would suffer if their Confidential Information was wrongfully disclosed.

173. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals

whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiff and Class Members' Confidential Information.

174. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the Confidential Information in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access; and

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their Confidential Information.

175. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their Confidential Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

176. Defendant also had a duty to exercise appropriate clearinghouse

practices to remove Confidential Information it was no longer required to retain under applicable regulations.

177. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the Confidential Information of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

178. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendant with their Confidential Information, a necessary part of obtaining services from Defendant.

179. The risk that unauthorized persons would attempt to gain access to the Confidential Information and misuse it was foreseeable. Given that Defendant hold vast amounts of Confidential Information, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the Confidential Information — whether by malware or otherwise.

180. Confidential Information is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the Confidential Information of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

181. Defendant improperly and inadequately safeguarded the Confidential

Information of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

182. Defendant breached these duties as evidenced by the Data Breach.

183. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' Confidential Information by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the Confidential Information was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

184. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Confidential Information of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

185. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

186. Defendant has admitted that Confidential Information of the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data

Breach.

187. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

188. And, on information and belief, Plaintiff's Confidential Information has already been published—or will be published imminently—by cybercriminals on the dark web.

189. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their Confidential Information by criminals, improper disclosure of their Confidential Information, lost benefit of their bargain, lost value of their Confidential Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION

### Negligence Per Se

### (On Behalf of Plaintiff and the Class)

190. Plaintiff incorporates by reference all other paragraphs as if fully set

forth herein.

191. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Confidential Information.

192. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the Confidential Information entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive Confidential Information.

193. Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Confidential Information.

194. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Confidential Information and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Confidential Information Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

195. The harm that has occurred is the type of harm the FTC Act is intended to

guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

196. But for Defendant's wrongful and negligent breach of its duties owed, Plaintiff and Class Members would not have been injured.

197. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendant's breach of their duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their Confidential Information.

198. Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence per se.

199. As a direct and proximate result of Defendant's negligence per se, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as detailed *supra*).

## THIRD CAUSE OF ACTION

**Breach of Implied Contract**

**(On Behalf of Plaintiff and the Class)**

200. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

201. Plaintiff and Class Members were required to provide their Confidential Information to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members provided their Confidential Information to Defendant or its third-party agents in exchange for Defendant's services.

202. Plaintiff and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

203. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Confidential Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

204. Plaintiff and the Class Members accepted Defendant's offers by disclosing their Confidential Information to Defendant or its third-party agents in exchange for services.

205. In turn, and through internal policies, Defendant agreed to protect and not disclose the Confidential Information to unauthorized persons.

206. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiff's and Class Member's Confidential Information.

207. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their Confidential Information.

208. After all, Plaintiff and Class Members would not have entrusted their Confidential Information to Defendant in the absence of such an agreement with Defendant.

209. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

210. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

211. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

212. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic Confidential Information that Defendant created, received, maintained, and transmitted.

213. In these and other ways, Defendant violated its duty of good faith and fair dealing.

214. Defendant's material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

215. And, on information and belief, Plaintiff's Confidential Information has already been published—or will be published imminently—by cybercriminals on the dark web.

216. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**FOURTH CAUSE OF ACTION**

**Unjust Enrichment**

**(On Behalf of Plaintiff and the Class)**

217. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

218. This claim is pleaded in the alternative to currently pleaded or future contract claims.

219. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from using their Confidential Information to facilitate services.

220. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

221. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the Confidential Information that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

222. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' Confidential Information.

223. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and Class Members' Confidential Information because Defendant failed to adequately protect their Confidential Information.

224. Plaintiff and Class Members have no adequate remedy at law.

225. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

## FIFTH CAUSE OF ACTION

### Violation of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq*.

### (On Behalf of Plaintiff and the Class, or, alternatively, the California Subclass)

226. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

227. Defendant is a healthcare provider, health care service plan, and/or contractor who is subject to the requirements and mandates of the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56, et seq.

228. Defendant is deemed to be a "provider of health care" for purposes of the CMIA because it is "organized for the purpose of maintaining medical information in order to make the information available to an individual or to a provider of health care at the request of the individual or a provider of health care." Cal. Civ. Code § 56.06(a).

229. Plaintiff and Class Members are "patient[s]," "whether or not still living, who received health care services from a provider of health care and to whom

medical information pertains." Cal. Civ. Code § 56.05(l).

230. Plaintiff and Class Members provided their personal medical information to Defendant.

231. At all relevant times, Defendant collected, stored and managed Plaintiff's and Class Members' personal medical information.

232. Section 56.10(a) of the CMIA provides that "[a] provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."

233. Section 56.101(a) of the CMIA provides that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Section 56.101(b)(1)(A) further provides that "[a]n electronic health record system or electronic medical record system . . . [p]rotect and preserve the integrity of electronic medical information."

234. Section 56.35 of the CMIA provides that "[i]n addition to any other

remedies available at law, a patient whose medical information has been used or disclosed in violation of Section 56.10, 56.104, 56.107, or 56.20 or subdivision (a) of Section 56.26 and who has sustained economic loss or personal injury therefrom may recover compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorney's fees not to exceed one thousand dollars ($1,000), and the costs of litigation."

235. Section 56.36(b) of the CMIA provides the following:

> In addition to any other remedies available at law, an individual may bring an action against a person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following:
>
> (1) Except as provided in subdivision (e), nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it is not necessary that the plaintiff suffered or was threatened with actual damages.
>
> (2) The amount of actual damages, if any, sustained by the patient.

236. Defendant has misused, disclosed, and/or otherwise allowed third parties to access and view Plaintiff's and Class Members' personal medical information without their written authorization in violation of Civil Code §§ 56.10, 56.11, 56.13, 56.26, and 56.101.

237. Defendant negligently created, maintained, preserved, and stored Plaintiff's and Class Members' medical information in a manner that failed to preserve its confidentiality, thereby exposing the information to a significant,

realistic, and appreciable risk of unauthorized access or use. That risk was not speculative or theoretical: a malicious third party intentionally infiltrated Defendant's computer network, maintained access for two days, and, upon information and belief, accessed, acquired, copied, and exfiltrated files containing Plaintiff's and Class Members' medical information. Defendant thereby caused a breach of confidentiality and negligent release of medical information in violation of Civil Code section 56.101, subdivision (a), and within the meaning of Civil Code section 56.36, subdivision (b).

238. As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care, Plaintiff's and Class Members' personal medical information was disclosed without written authorization.

239. By disclosing Plaintiff's and Class Members' Private Information without their written authorization, Defendant violated California Civil Code § 56, et seq., and their legal duty to protect the confidentiality of such information.

240. Defendant also violated Sections 56.06 and 56.101 of the California CMIA, which prohibit the negligent creation, maintenance, preservation, storage, abandonment, destruction or disposal of confidential personal medical information

241. Defendant violated the CMIA by (1) failing to implement reasonable administrative, physical and technical safeguards to protect, secure and prevent the unauthorized access to, and acquisition of, Plaintiff's and Class Members' personal medical information; (2) failing to implement reasonable data security measures,

such as intrusion detection processes that detect data breaches in a timely manner, to protect and secure Plaintiff's and Class Members' personal medical information; (3) failing to use reasonable authentication procedures to track Plaintiff's and Class Members' personal medical information in case of a security breach; and (4) allowing undetected and unauthorized access to servers, networks and systems where Plaintiff's and Class Members' personal medical information was kept, all in violation of the CMIA.

242. Defendant further violated the CMIA by negligently allowing unauthorized third parties to access Plaintiff's and Class Members' medical information.

243. As a result of the Data Breach, unauthorized parties obtained personal medical information, viewed it, and now have it available to them to sell to others bad actors, including on the dark web, post the information on the dark web or otherwise misuse.

244. As a further result of the Data Breach, the confidential nature of Plaintiff's and Class Members' medical information was breached as a result of Defendant's negligence. Specifically, Defendant knowingly allowed and affirmatively acted in a manner that exposed Plaintiff's and Class Members' medical information to a significant risk of unauthorized access or use.

245. Defendant's failure to implement adequate data security measures to protect the PHI of Plaintiff and Class Members was a substantial factor in allowing

unauthorized parties to access Defendant's computer systems and acquire the PHI of Plaintiff and California Subclass members.

246. As a direct and proximate result of Defendant's violation of the CMIA, Defendant allowed the PHI of Plaintiff and Class Members to (a) escape and spread from its normal place of storage through unauthorized disclosure or release; and (b) be accessed and acquired by unauthorized parties in order to, view, mine, exploit, use, and/or profit from their personal medical information, thereby breaching the confidentiality of their personal medical information. Plaintiff and Class Members have accordingly sustained and will continue to sustain actual damages as set forth above.

247. As a direct and proximate result of Defendant's wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff's and Class Members' personal medical information was viewed by, released to, and disclosed to third parties without Plaintiff's and Class Members' written authorization.

248. As a direct and proximate result of Defendant's above-described wrongful actions, inaction, omissions, and want of ordinary care that directly and proximately caused the Data Breach and their violation of the CMIA, Plaintiff and Class members are entitled to (i) actual damages, (ii) nominal damages of $1,000 per Plaintiff and Class Member, (iii) punitive damages of up to $3,000 per Plaintiff and Class Member, and (iv) attorneys' fees, litigation expenses, and court costs

under California Civil Code § 56.35 and 56.36.

**<u>SIXTH CAUSE OF ACTION</u>**

**Violation of the California Unfair Competition Law,**

**Cal. Bus. & Prof. Code § 17200, *et seq*.**

**Unlawful, Fraudulent, and Unfair Business Practices**

**(On Behalf of Plaintiff and the Class, or, alternatively, the California Subclass)**

249. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

250. The California Unfair Competition Law, Cal. Bus. & Prof. Code sections 17200, et seq. ("UCL"), prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising, as defined by the UCL and relevant case law.

251. By reason of Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized disclosure of Plaintiff's and Class Members' Confidential Information, Defendant engaged in unlawful, unfair, and fraudulent practices within the meaning of the UCL.

252. Defendant has violated Cal. Bus. and Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices and unfair, deceptive, untrue, or misleading advertising that constitute acts of "unfair competition" as defined in Cal. Bus. Prof. Code § 17200 with respect to the services

provided to the Nationwide Class.

253. Defendant's business practices as alleged herein are unfair because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, in that the Confidential Information of Plaintiff and Class Members has been compromised for unauthorized parties to see, use, and otherwise exploit.

254. Defendant's above-described wrongful actions, inaction, and omissions, the resulting Data Breach, and the unauthorized release and disclosure of Plaintiff's and Class Members Confidential Information also constitute "unfair" business acts and practices within the meaning of Business & Professions Code sections 17200, et seq., in that Defendant's conduct was substantially injurious to Plaintiff and Class Members, offensive to public policy, immoral, unethical, oppressive and unscrupulous, and the gravity of Defendant's conduct outweighs any alleged benefits attributable to such conduct.

255. Defendant engaged in unlawful acts and practices with respect to the services by establishing the sub-standard security practices and procedures described herein; by soliciting and collecting Plaintiff's and Class Members' Confidential Information with knowledge that the information would not be adequately protected; by violating the California Confidentiality Of Medical Information Act, Cal. Civ. Code § 56, et seq.; by violating the other statutes described above; and by storing Plaintiff's and Class Members Confidential

Information in an unsecure electronic environment in violation of HIPAA and California's data breach statute, Cal. Civ. Code § 1798.81.5, which require Defendant to take reasonable methods of safeguarding the Confidential Information of Plaintiff and the Class Members.

256. Defendant's practices were also unlawful and in violation of Civil Code sections 1798, et seq. and Defendant's own privacy policy because Defendant failed to take reasonable measures to protect Plaintiff's and Class Members Confidential Information and failed to take remedial measures such as notifying their users when they first discovered that their Confidential Information may have been compromised.

257. In addition, Defendant engaged in unlawful acts and practices by failing to disclose the Data Breach in a timely and accurate manner, contrary to the duties imposed by Cal. Civ. Code § 1798.82 and Cal. Health & Safety Code §1280.15(b)(2).

258. Defendant's business practices as alleged herein are fraudulent because they are likely to deceive consumers into believing that the Confidential Information they provided to Defendant will remain private and secure, when in fact it has not been maintained in a private and secure manner, and that Defendant would take proper measures to investigate and remediate a data breach, when Defendant did not do so.

259. Plaintiff and Class Members suffered (and continue to suffer) injury in

fact and lost money or property as a direct and proximate result of Defendant's above-described wrongful actions, inaction, and omissions including, inter alia, the unauthorized release and disclosure of their Confidential Information and lack of notice.

260. But for Defendant's misrepresentations and omissions, Plaintiff and Class Members would not have provided their Confidential Information to Defendant or would have insisted that their Confidential Information be more securely protected.

261. As a direct and proximate result of Defendant's unlawful practices and acts, Plaintiff and Class Members were injured and lost money or property, including but not limited to the price received by Defendant for the services, the loss of Plaintiff's and Class Members legally protected interest in the confidentiality and privacy of their Confidential Information, nominal damages, and additional losses as described herein.

262. Defendant knew or should have known that Defendant's computer systems and data security practices were inadequate to safeguard Plaintiff's and Class Members Confidential Information and that the risk of a data breach or theft was highly likely. Defendant's actions in engaging in the above-named unlawful practices and acts were negligent, knowing and willful, and/or wanton and reckless with respect to the rights of Plaintiff and Class Members.

263. Plaintiff seeks prospective injunctive relief, including improvements to

Defendant's data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Confidential Information that remains in Defendant's custody, including but not limited to the following:

a. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendant audit, test, and train their security personnel regarding any new or modified procedures;

d. Ordering that Defendant segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Ordering that Defendant not transmit Confidential Information via unencrypted email;

f. Ordering that Defendant not store Confidential Information in email accounts;

g. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendant's services;

h. Ordering that Defendant conduct regular computer system scanning and security checks;

i. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j. Ordering Defendant to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Confidential Information to third parties, as well as the steps they must take to protect themselves.

264. Unless such Class-wide injunctive relief is issued, Plaintiff and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff (and other consumers) can rely on Defendant's representations regarding its data security in the future.

265. Furthermore, in the alternative to all legal remedies sought herein, Plaintiff, on behalf of the Class, seek relief under Cal. Bus. & Prof. Code § 17200, et seq., including, but not limited to, restitution to Plaintiff and Class Members of money or property that Defendant may have acquired by means of Defendant's

unlawful, and unfair business practices, restitutionary disgorgement of all profits accruing to Defendant because of Defendant's unlawful and unfair business practices, declaratory relief, attorneys' fees and costs (pursuant to Cal. Code Civ. Proc. § 1021.5), and injunctive or other equitable relief.

**<u>SEVENTH CAUSE OF ACTION</u>**

**Violation of California Consumers Legal Remedies Act**

**Cal. Civ. Code § 1750, *et seq*.**

**(On Behalf of Plaintiff and the Class, or, alternatively, the California Subclass)**

266. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

267. This cause of action is brought pursuant to the California Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq*. This cause of action does not seek monetary damages at this time but is limited solely to injunctive relief. Plaintiff will later amend this Complaint to seek damages in accordance with the CLRA after providing Defendant with notice required by California Civil Code § 1782.

268. On or about October 27, 2026, Plaintiff sent Defendant notice pursuant to the CLRA. Defendant is the party with the most knowledge of the underlying facts giving rise to Plaintiff's allegations, so that any pre-suit notice would not put Defendant in a better position to evaluate those claims.

269. Plaintiff and Class Members are "consumers," as the term is defined by

California Civil Code § 1761(d).

270. Plaintiff, Class Members, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

271. The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the CLRA, and the conduct was undertaken by Defendant was likely to deceive consumers.

272. Cal. Civ. Code § 1770(a)(5) prohibits one who is involved in a transaction from "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have."

273. Defendant violated this provision by representing that they took appropriate measures to protect Plaintiff's and the Class Members' Confidential Information. Additionally, Defendant improperly handled, stored, or protected either unencrypted or partially encrypted data.

274. Plaintiff and Class Members relied upon Defendant's representations and were induced to sign up for Defendant's services and provide their Confidential Information which contains value in order to obtain services from Defendant.

275. As a result, Plaintiff and Class Members were induced to enter into a relationship with Defendant and provide their Confidential Information.

276. As a result of engaging in such conduct, Defendant have violated Civil Code § 1770.

277. Pursuant to Civil Code § 1780(a)(2) and (a)(5), Plaintiff seeks an order of this Court that includes, but is not limited to, an order enjoining Defendant from continuing to engage in unlawful, unfair, or fraudulent business practices or any other act prohibited by law.

278. Plaintiff and Class Members suffered injuries caused by Defendant's misrepresentations, because they provided their Confidential Information believing that Defendant would adequately protect this information.

279. Plaintiff and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

280. The unfair and deceptive acts and practices of Defendant, as described above, present a serious threat to Plaintiff and Class Members.

281. Plaintiff seeks prospective injunctive relief, including improvements to Defendant's data security systems and practices, in order to ensure that such security is reasonably sufficient to safeguard patients' Confidential Information that remains in Defendant's custody, including but not limited to the following:

a. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

b. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

c. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

d. Ordering that Defendant segment patient data by, among other things, creating firewalls and access controls so that if one area of Defendant's systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

e. Ordering that Defendant not transmit Confidential Information via unencrypted email;

f. Ordering that Defendant not store Confidential Information in email accounts;

g. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner patient data not necessary for provisions of Defendant's services;

h. Ordering that Defendant conduct regular computer system scanning and security checks;

i. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

j. Ordering Defendant to meaningfully educate their current, former, and prospective patients about the threats they face as a result of the loss of their Confidential Information to third parties, as well as the steps they must take to protect themselves.

282. Unless such Class-wide injunctive relief is issued, Plaintiff and Class Members remain at risk, and there is no other adequate remedy at law that would ensure that Plaintiff (and other consumers) can rely on Defendant's representations regarding their data security in the future.

## EIGHTH CAUSE OF ACTION

**Violation of California Consumer Records Act**

**Cal. Civ. Code § 1798.80 *et seq*.**

**(On Behalf of Plaintiff and the Class, or, alternatively, the California Subclass)**

283. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

284. Section 1798.2 of the California Civil Code requires any "person or business that conducts business in California, and that owns or licenses computerized data that includes personal information" to "disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Under section 1798.82, the disclosure "shall be made in the

most expedient time possible and without unreasonable delay . . . .”

285. The CCRA further provides: “Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.” Cal. Civ. Code § 1798.82(b).

286. Any person or business that is required to issue a security breach notification under the CCRA shall meet all of the following requirements:

a. The security breach notification shall be written in plain language;

b. The security breach notification shall include, at a minimum, the following information:

i. The name and contact information of the reporting person or business subject to this section;

ii. A list of the types of personal information that were or are reasonably believed to have been the subject of a breach;

iii. If the information is possible to determine at the time the notice is provided, then any of the following:

1. The date of the breach;
2. The estimated date of the breach; or
3. The date range within which the breach occurred. The

notification shall also include the date of the notice.

iv. Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided;

v. A general description of the breach incident, if that information is possible to determine at the time the notice is provided; and

vi. The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a Social Security number or a driver's license or California identification card number.

287. The Data Breach described herein constituted a "breach of the security system" of Defendant.

288. As alleged above, Defendant unreasonably delayed informing Plaintiff and Class Members about the Data Breach, affecting their Personal and Medical Information, after Defendant knew the Data Breach had occurred.

289. Defendant failed to disclose to Plaintiff and Class Members, without unreasonable delay and in the most expedient time possible, the breach of security of their unencrypted, or not properly and securely encrypted, Personal and Medical Information when Defendant knew or reasonably believed such information had been compromised.

290. Defendant's ongoing business interests gave Defendant incentive to conceal the Data Breach from the public to ensure continued revenue.

291. Upon information and belief, no law enforcement agency instructed Defendant that timely notification to Plaintiff and Class Members would impede its investigation.

292. As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members were deprived of prompt notice of the Data Breach and were thus prevented from taking appropriate protective measures, such as securing identity theft protection or requesting a credit freeze. These measures could have prevented some of the damages suffered by Plaintiff and Class Members because their stolen information would have had less value to identity thieves.

293. As a result of Defendant's violation of Cal. Civ. Code § 1798.82, Plaintiff and Class Members suffered incrementally increased damages separate and distinct from those simply caused by the Data Breach itself.

294. Plaintiff and Class Members seek all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to the damages suffered by Plaintiff and Class Members as alleged above and equitable relief.

295. Defendant's misconduct as alleged herein is fraud under Cal. Civ. Code § 3294(c)(3) in that it was deceit or concealment of a material fact known to the Defendant conducted with the intent on the part of Defendant of depriving Plaintiff and Class Members of "legal rights or otherwise causing injury." In addition, Defendant's misconduct as alleged herein is malice or oppression under Cal. Civ. Code § 3294(c)(1) and (c)(2) in that it was despicable conduct carried on by

Defendant with a willful and conscious disregard of the rights or safety of Plaintiff and Class Members and despicable conduct that has subjected Plaintiff and Class Members to hardship in conscious disregard of their rights. As a result, Plaintiff and Class Members are entitled to punitive damages against Defendant under Cal. Civ. Code § 3294(a).

**NINTH CAUSE OF ACTION**

**Violation of California Consumer Privacy Act**

**Cal. Civ. Code § 1798.150, et seq.**

**(On Behalf of Plaintiff and the Class, or, alternatively, the California Subclass)**

296. Plaintiff restates and realleges all of the foregoing paragraphs as if fully set forth herein.

297. Cal. Civ. Code § 1798.150(a) of the California Consumer Privacy Act ("CCPA") provides that "[a]ny consumer whose nonencrypted and nonredacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5 . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action" for statutory damages, actual damages, injunctive relief, declaratory relief and any other relief the court deems proper.

298. On or about October 27, 2026, Plaintiff on behalf of her and all Class

Members, sent Defendant notice pursuant to the CCPA. Defendant is the party with the most knowledge of the underlying facts giving rise to Plaintiff's allegations, so that any pre-suit notice would not put Defendant in a better position to evaluate those claims.

299. Plaintiff and California Subclass members are "consumers" as defined by Cal. Civ. Code § 1798.140(g) because they are natural persons who reside in California.

300. Quest is a "business" as defined by Cal. Civ. Code § 1798.140(c) because it is a corporation organized for the profit or financial benefit of their shareholders or owners and has gross annual revenues in excess of $26.625 million dollars.

301. Plaintiff and California Subclass members provided Defendant with their nonencrypted and nonredacted personal information as defined in § 1798.81.5 in the form of their PII/PHI. The information Plaintiff and California Subclass members provided to Defendant included medical information under the CMIA and protected health information under HIPAA, as well as non-medical patient information (such as social security numbers, addresses, dates of birth, telephone numbers, among other information).

302. Plaintiff asserts this claim with respect to personal information that is not medical information governed by the CMIA or protected health information governed by HIPAA. Upon information and belief, at least some of the

compromised information identified above was collected and maintained by Defendant for nonmedical administrative, financial, identity-verification, or account-management purposes and was not governed by the CMIA or HIPAA. Alternatively, to the extent Defendant contend that it qualifies as a healthcare provider or covered entity under Civil Code section 1798.145, subdivision (c)(1)(B), Plaintiff alleges that Defendant did not maintain all nonmedical patient information in the same manner as medical information or protected health information. The details concerning Defendant's data architecture, storage practices, access controls, and segregation of medical and nonmedical information are within Defendant's exclusive possession and will be developed through discovery.

303. Defendant failed to take sufficient and reasonable measures to safeguard their data security systems and protect Plaintiff's and California Subclass members' highly sensitive personal information and medical data from unauthorized access. Defendant's failure to maintain adequate data protections subjected Plaintiff's and the California Subclass members' nonencrypted and nonredacted sensitive personal information to exfiltration and disclosure by malevolent actors.

304. The unauthorized access, exfiltration, theft, and disclosure of Plaintiff's and the California Subclass members' Private Information were a result of Defendant's violation of their duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information.

305. Under Defendant's duty to protect customers' Private Information, they were required to implement reasonable security measures to prevent and deter hacks from accessing the Private Information of its customers. That these vulnerabilities existed and enabled unauthorized third parties to access and harvest customers' Private Information evidence that Defendant have breached that duty.

306. Upon information and belief, the exfiltrated personal information was accessible to the unauthorized third party in readable form and was not encrypted or redacted within the meaning of Civil Code section 1798.150, subdivision (a)(1).

307. As a direct and proximate result of Defendant's violations, Plaintiff and the California Subclass members suffered actual pecuniary damages, including reasonable and necessary out-of-pocket expenditures incurred to protect their financial accounts and identities from the consequences of the Data Breach.

308. Plaintiff and California Subclass members seek all monetary and non-monetary relief allowed by law, including actual or nominal damages; statutory damages pursuant to Cal. Civ. Code § 1798.150(a)(1)(A) in an amount not less than one hundred dollars ($100) and not greater than seven hundred fifty dollars ($750) per consumer per incident, as adjusted pursuant to Cal. Civ. Code § 1798.199.95(d), or actual damages, whichever is greater; declaratory and injunctive relief, including an injunction barring Defendant from disclosing their PHI/PII without their consent; reasonable attorneys' fees and costs; and any other relief that is just and proper.

## TENTH CAUSE OF ACTION

**Declaratory Judgment**

**(On Behalf of Plaintiff and the Class)**

309. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

310. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

311. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff alleges that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

312. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by

failing to use reasonable measures to the data entrusted to it; and

d. Defendant's breach of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

313. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

314. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

315. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages— while warranted for out-of-pocket damages and other legally quantifiable and provable damages— cannot cover the full extent of Plaintiff and Class Members' injuries.

316. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

317. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and all members of the Classes, request judgment against the Defendant and that the Court grant the following relief:

A. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Classes requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the Classes requested herein;

B. Injunctive relief requiring Defendant to (1) strengthen their data security systems that maintain personally identifying information to comply with the applicable state laws alleged herein (including, but not limited to, the California Customer Records Act) and best practices under industry standards; (2) engage third-party auditors and internal personnel to conduct security testing and audits on Defendant's systems on a periodic basis; (3) promptly correct any problems or issues detected by such audits and testing; and (4) routinely and continually conduct training to inform internal security personnel how to prevent, identify and contain a breach, and how to appropriately respond;

C. An order requiring Defendant to pay all costs associated with class notice and administration of class-wide relief;

D. An award to Plaintiff and all members of the Classes of compensatory, consequential, incidental, nominal, and statutory damages, restitution,

and disgorgement, in an amount to be determined at trial;

E. That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law, including but not limited to the following:

a. Compensatory damages, punitive damages not to exceed three thousand dollars ($3,000), attorneys' fees not to exceed one thousand dollars ($1,000), and the costs of litigation under Civil Code § 56.35;

b. Nominal damages of one thousand dollars ($1,000) for each violation under Civil Code § 56.36(b)(1);

c. Actual damages suffered, according to proof, for each violation under Civil Code § 56.36(b)(2);

d. Not less than $100 and not greater than $750 per California Subclass Member per incident, as adjusted pursuant to Cal. Civ. Code § 1798.199.95(d), or actual damages, whichever is greater, pursuant to Cal. Civ. Code § 1798.150(a)(1)(A);

e. Injunctive relief pursuant to Civil Code § 1798.84(e); and

f. All other damages, injunctive relief, attorneys' fees, expenses and costs permitted by law or statute.

F. An award of credit and medical monitoring and identity theft protection services to Plaintiff and all members of the Classes;

G. An award of attorneys' fees, costs, and expenses, as provided by law or

equity;

H. An award for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

I. An order requiring Defendant to pay pre-judgment and post-judgment interest, as provided by law or equity; and

J. Any such other and further relief as this Court may deem just and proper.

Date: November 2, 2026

Respectfully submitted,

*/s/ Genevieve Outlaw*
Genevieve Outlaw (NJ 063152014)
Daniel S. Robinson (Pro Hac Forthcoming)
Michael W. Olson (Pro Hac Forthcoming
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com
goutlaw@robinsonfirm.com
molson@robinsonfirm.com

*Attorneys for Plaintiff and Proposed Class*

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all claims so triable.

Date: November 2, 2026

Respectfully submitted,

*/s/ Genevieve Outlaw*

Genevieve Outlaw (NJ 063152014)
Daniel S. Robinson (Pro Hac Forthcoming)
Michael W. Olson (Pro Hac Forthcoming
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax: (949) 720-1292
drobinson@robinsonfirm.com
goutlaw@robinsonfirm.com
molson@robinsonfirm.com

*Attorneys for Plaintiff and Proposed Class*